**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LESLYE A. YOUNG,**

**Plaintiff,**

**vs.**                                                                     **7:05-CV-1027**
                                                                              **(NAM/GHL)**

**MICHAEL J. ASTRUE\*,**
**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**
_____

**APPEARANCES:**                                     **OF COUNSEL:**

Conboy, McKay, Bachman & Kendall, LLP     Lawrence D. Hasseler, Esq.
407 Sherman Street
Watertown, New York 13601
_Attorney for Plaintiff_

Andrew T. Baxter                                       William H. Pease, Esq.
Acting United States Attorney for
the Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel                            Barbara Spivak, Esq.
Social Security Administration                      Arthur Swerdloff, Esq.
26 Federal Plaza
New York, New York 10278
_Attorney s for Defendant_

        \*\* On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social
        Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
        automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in
        this action.

**NORMAN A. MORDUE, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.        INTRODUCTION**

Plaintiff Leslye A. Young brings the above-captioned action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for disability insurance benefits ("DIB").  (Dkt. No. 1).  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB on June 2, 2003.  (Administrative Transcript at p. 52).[1]  The application was denied on July 31, 2003.  (T. 36-42).  On August 10, 2003, plaintiff filed a request for reconsideration which was denied on September 11, 2003.  (T. 27-34).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on January 13, 2005.  (T. 226).  On March 10. 2005, ALJ Thomas G. Norman issued a decision denying plaintiff's claim for benefits.  (T. 11-17).  The Appeals Council denied plaintiff's request for review on June 20, 2005, making the ALJ's decision the final determination of the Commissioner.  (T. 3).  This action followed.

## III.    FACTUAL BACKGROUND

Plaintiff was born on November 11, 1969 and was 35 years old at the time of the administrative hearing on November 23, 2004. (T. 67, 231).  Plaintiff currently lives in Fort Drum, New York with her husband, David R. Young, and their 3 children ages 8, 7 and 3.  (T. 3, 229).  In 2003, when plaintiff applied for DIB, she resided with her husband and children in Huntsville, Texas.  (T. 52, 231).  Prior to residing in Texas, plaintiff lived with her children in Fort Stewart, Georgia while her husband was on active duty with the United States Army in Kuwait.

---

[1] Portions of the administrative transcript, Dkt. No. 5, will be cited herein as "(T__)."

(T. 229).

Plaintiff received her GED and attended two years of classes at a "business college". (T. 87).  From 1992 until 1996, plaintiff was employed as a retail salesperson and waitress. (T. 69). From February 1998 until April 1999, plaintiff was employed as a collections manager for two different "rent-to-own" businesses, Prime Time Rentals and Aaron's Rentals. (T. 69, 204, 233). Plaintiff was responsible for collecting past due accounts.  (T. 72).  Plaintiff worked on a computer, wrote reports and called clients on the telephone.  (T. 72).  Plaintiff's job did not involve any lifting or carrying. (T. 72).  Plaintiff was required to sit eight hours each day and write, type or handle small objects eight hours each day. (T. 72).  Plaintiff's job at Prime Time required plaintiff to visit clients at home to establish payment plans if plaintiff was unable to contact the client via telephone. (T. 233).  From July 1999 until May 2000, plaintiff was employed as a collections clerk/manager for Premier Medical Group, a medical insurance company. (T. 70, 204, 232).  Plaintiff was responsible for collecting past due medical accounts for doctors.  (T. 70).  Plaintiff worked on a computer and called clients on the telephone.  (T. 70). Plaintiff's job did not involve any lifting or carrying. (T. 70).  Plaintiff was required to sit seven hours each day and write, type or handle small objects eight hours each day. (T. 70). From October 2000 until April 2001, plaintiff was employed at The Pennysaver, a newspaper in Hinesville, Georgia. (T. 204).  Plaintiff worked in the advertising department and was responsible for advertising sales, photographs and placement. (T. 204).   Plaintiff's last day of employment in any capacity was July 10, 2001 due to the birth of her youngest child.[2] (T. 81).  Plaintiff claims she became disabled on August 1, 2002 due to several "cracked discs" in her back and

_____

[2] The record does not indicate where plaintiff was employed from April 2001until July 2001.

degenerative bone disease. (T. 11, 81).

### A.    Medical Treatment

A review of the record reveals that plaintiff was treated for her alleged disabling conditions at Winn Army Community Hospital, Eisenhower Army Medical Center and Joint and Spine Center, P.C.  Plaintiff also received treatment from Glenda Read, M.D., Sajid Z. Malik, M.D. and Cherry Matthew, M.D.

Winn Army Community Hospital[3]

On March 1, 2002, plaintiff appeared at the emergency room of Winn Hospital complaining of back, neck and shoulder pain.  (T. 157).  Plaintiff was referred to the Family Practice Clinic and was treated by Dr. Jose Hernandez. (T. 155-158).  Plaintiff complained of chronic back pain (with a severity of 10 on a scale of 1-10) that had been present for 3 months. (T. 155-158).  Plaintiff stated that the pain in her mid-back "radiated to middle of her chest" but denied any numbness or tingling in her legs. (T. 153).  Plaintiff advised Dr. Hernandez that she was not taking any medications and stated that she was a "stay at home mom of a 3 month old and 4 year old".  (T. 156).  Dr. Hernandez's physical assessment of plaintiff was "normal". (T. 156). Dr. Hernandez prescribed Ibuprofen and Flexeril.[4]

On October 21, 2002, plaintiff returned to the Family Practice Clinic complaining of back pain and was treated by Dr. Delano Parker. (T. 140).   Plaintiff denied experiencing any trauma or injury and stated that the pain did not radiate. (T. 140). Upon examination, Dr. Parker noted a

---

[3] Some medical records from Winn Army Community Hospital contain plaintiff's complaints of conditions/ailments that are unrelated to the within action. The records pertaining to unrelated treatment have been omitted from this discussion.

[4] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary*, 465, 725 (31st ed. 2007).

decreased range of motion, negative straight leg raising, and strength "5/5". Dr. Parker diagnosed plaintiff with "chronic low LBD", ordered x-rays and prescribed Motrin.[5]

On October 22, 2002, x-rays were taken of plaintiff's lumbar spine. The radiologist noted mild L5-S1 disc space narrowing and concluded "minor abnormality". (T. 175). The radiologist did not detect any "spondylolysis [sic] or spondylolisthesis".[6] (T. 175).

On October 28, 2002, plaintiff returned to the Family Practice Clinic complaining of back pain and was treated by Dr. Grant Foster. (T. 137). Plaintiff denied any numbness or tingling. (T. 137). Dr. Foster noted that plaintiff's examination was "normal" and her neurological examination was "non-focal". (T. 135). Dr. Foster found that plaintiff was not tender to palpation over the cervical, lumbar or thoracic areas. (T. 135). Dr. Foster diagnosed plaintiff with chronic back pain "probably due to lifting children and improper lifting technique". (T. 135). Dr. Foster prescribed Ibuprofen and Elavil and ordered additional x-ray films.[7] (T. 135). Dr. Foster advised plaintiff to avoid heavy lifting and use heat and massage. (T. 135). On October 28, 2002, x-rays were taken of plaintiff's thoracic and cervical spine. (T. 174-174). The radiologist's impression of the films was "normal". (T. 173-174).

On October 31, 2002, plaintiff appeared at the Physical Therapy Clinic and was evaluated by Amy Lyyski, PT. (T. 132). Plaintiff advised Ms. Lyyski that her spouse was in Kuwait so plaintiff "must take baby to all appointments and no one to care for his special needs". (T. 132).

---

[5] Motrin is a nonsteroidal anti-inflammatory drug for the treatment of pain, fever, dysmenorrhea, osteoarthritis, rheumatoid arthritis, and other rheumatic and non-rheumatic inflammatory disorders. *Dorland's* at 923, 1201.

[6] Spondylosis is a degenerative spinal change due to osteoarthritis. *Id*. at 1780. Spondylolisthesis is forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, usually due to a developmental defect. *Id*. at 1779.

[7] Elavil is a tricyclic antidepressant; it is also used in the treatment of chronic pain. *Id*. at 64, 606.

Plaintiff advised the therapist that Elavil gave her side effects and that she needed to be alert for her baby.  (T. 132).  Ms. Lyyski noted that plaintiff's neurological examination was unremarkable.  (T. 132).  Ms. Lyyski further found that plaintiff was tender to palpation, exhibited pain in her lower back on extension, and positive straight leg raising at 90 degrees.  (T. 132).  Ms. Lyyski suggested that plaintiff receive treatment once a month.  (T. 132).

On October 31, 2002, plaintiff had a telephone consultation with Dr. Foster.  (T. 127).  Dr. Foster spoke with plaintiff regarding her medical and home situation.  (T. 127).  Dr. Foster indicated that he spoke with a Red Cross representative regarding the possible redeployment of plaintiff's husband.  (T. 127).  Dr. Foster stated that "[f]rom a medical point of view, "patient is ambulatory, stable and neurologically intact.  Redeployment would not be typically authorized." (T. 127).   Dr. Foster further noted that due to plaintiff's social situation and lack of an appropriate family care plan, redeployment may need to be considered.  (T. 127).  Dr. Foster noted that plaintiff had been referred for "trial physical therapy" .  (T. 127).  Dr. Foster stated that if plaintiff "fails to improve with conservative management over the next month, I would recommend an MRI".  (T. 128).

On November 5, 2002 plaintiff had a further telephone consultation with Dr. Foster.  (T. 124).  Dr. Foster stated that he spoke with Cpt. Woods at plaintiff's husband's unit.  (T. 124).  Cpt. Woods indicated he would forward Dr. Foster's concerns to plaintiff's husband in Kuwait so that he could decide whether he wished to be redeployed.  (T. 124).  Dr. Foster also advised plaintiff that he spoke with the Red Cross and stated that "[I] cannot say that there is a medical necessity for the servicemember's redeployment based on the patient's low back pain, since she is ambulatory, neurologically non-focal and not in need of emergency services".  (T. 124).  Dr.

Foster further noted that plaintiff's medications were not incapacitating nor did they significantly impair her ability to provide care for herself or her children.  (T. 124).  Dr. Foster opined that plaintiff should avoid heavy lifting and use proper lifting technique.  (T. 124).  Specifically, Dr. Foster noted that "20 - 25 pounds is not a big problem" and the "fact that she has a 23 pound baby should not a deciding factor". (T. 124).  Dr. Foster concluded that plaintiff's emotional situation and lack of options in the family care plan are "more important issues here".  (T. 124).  Dr. Foster diagnosed plaintiff with "lbp (neurologically intact) / possible ddd" and indicated he would evaluate plaintiff further if she failed to respond to physical therapy over the next several weeks. (T. 124).

On November 6, 2002 plaintiff was treated by Dr. Heather Hansen at the Family Practice Clinic for "left upper quad. pain for 1 year that extends under left rib cage".  (T. 124).  Plaintiff described the pain to Dr. Hansen as "not constant" and sharp with radiating pain to her lower back.  (T. 121).  Dr. Hansen advised plaintiff to continue taking Elavil.  (T. 122).  On November 7, 2002 plaintiff telephoned Dr. Foster and stated that she took "half of a 25 mg Elavil tablet" and that it caused drowsiness.  (T. 123).  Dr. Foster advised plaintiff to decrease her Elavil to 10 mg and to continue with physical therapy.  (T. 123).

On December 7, 2002, plaintiff had an MRI taken of her lumbar spine at the request of Dr. Foster.  (T. 169).  The radiologist found degenerative disc disease at L5-S1 with disk protrusion but no evidence of neural foraminal narrowing or nerve root impingement.  (T. 169).  The radiologist noted "minor abnormality" and "mild degenerative changes".  (T. 169).

On December 9, 2002, an EMG and nerve conduction study were performed by Dr.

Stephen G. Pappas.[8]  (T. 176).  Dr. Pappas' interpretation was "normal study".  (T. 177).

On December 19, 2002, plaintiff appeared for an examination by Dr. Foster and a consultation to discuss the results of her "MRI, EMG and NCV".  (T. 110).  Plaintiff advised Dr. Foster that she was taking Lortab and Elavil and that the medications relieved her pain temporarily.  (T. 110).  Dr. Foster noted that plaintiff frequently lifted and held one of her children during the interview despite his recommendation to avoid heavy lifting.  (T. 111).  Upon examination, Dr. Foster noted that plaintiff was alert, oriented and overweight.  (T. 111).  Dr. Foster found decreased range of motion with extension and good flexion.  (T. 111).  Dr. Foster noted that straight leg raising was negative bilaterally and that plaintiff was mildly tender to palpation over her lumbar spine without spasm.  (T. 111).  Dr. Foster's sensory examination revealed that plaintiff was "grossly intact" however, plaintiff's motor examination was difficult due to "poor effort" and "give way weakness on left side".  (T. 111).  Dr. Foster noted that plaintiff exhibited 4/5 strength in all muscle groups.  (T. 111).  Dr. Foster noted that plaintiff's EMG/NCV were negative and diagnosed plaintiff with " L-S DDD with LLE radiculopathic symptoms not responding to conservative management including physical therapy, use of narcotics and activity modification".[9]  (T. 111).  Dr. Foster noted that "part of the problem is noncompliance" with the lifting restriction as "evidence by patient lifting, holding and walking around the office today with her toddler in her arms while I took my history".  (T. 111).  Dr. Foster noted that plaintiff was resistant to Elavil due to the sedative effects on the lowest dosage.

---

[8] An EMG (an electromyogram) is a record of electromyography which is a technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. *Dorland's* at 609.

[9] LLE is an abbreviation for left lower extremity. MediLexicon, www.medilexicon.com/medicaldictionary (last visited May 2, 2008).

(T. 111).  Dr. Foster referred plaintiff to "pain clinic to consider epidural steroids" and to

neurosurgery to explore options.  (T. 112).  Dr. Foster stated that plaintiff should refrain from

heavy lifting and advised her to refill her prescriptions.  (T. 112).

Eisenhower Army Medical Center

On January 30, 2003, plaintiff had a telephone consultation with Theodore J. Choma,

M.D., an orthopedist affiliated with Eisenhower Army Medical Center.  (T. 184).  Plaintiff

complained of episodic pain in L-S region, mid-back, neck and headaches.  (T. 184).  Dr. Choma

indicated that he reviewed plaintiff's MRI films from December 2002 which revealed "normal

structures from T-12 - L5".  (T. 184).  Dr. Choma noted that the "L5- S1 disc is markedly

dessicated with a posterior annular tear and bulge at this disc".  (T. 184).  Dr. Choma described

disc degeneration to plaintiff and advised plaintiff that "normally" symptoms tend to fade with

time.  (T. 184).  Dr. Choma suggested that plaintiff use steroids for episodic flare ups.  (T. 184).

Dr. Choma stated that "it is my guess that she has other dessicated discs in the more proximal

spine, although I don't have images to prove it".  (T. 184).  Dr. Choma described surgical fusion

surgery but stated "I believe that this should be reserved for the most recalcitrant cases of pain

due to the downsides of surgery, even when it is successful".  (T. 184).  Plaintiff advised Dr.

Choma that she would try to cope with her symptoms.  (T. 184).

Glenda Read, M.D.

The record contains a report prepared by Dr. Glenda Read dated March 5, 2004 and

addressed to "Whom It May Concern".  (T. 187).  Dr. Read was affiliated with Huntsville

Pediatric & Adult Medicine Associates.[10]  (T. 187).  Dr. Read stated that she began treating

---

[10] The record does not indicate whether or not Dr. Read specialized in any area of medicine.

plaintiff on February 9, 2004.[11]  (T. 187).  Dr. Read noted that plaintiff complained of back pain in her upper, mid and lower back and further stated that physical therapy had not provided her with relief.  (T. 187).  Plaintiff advised Dr. Read that she was unable to perform activities of daily living and unable to work.  (T. 187).  Plaintiff reported a history of degenerative bone disease however, Dr. Read noted that "records for this have been requested but not received".  (T. 187).  Dr. Read stated that a physical examination of plaintiff, "at that time", revealed "essentially normal neurological exam without focal findings".  (T. 187).   Dr. Read recommended that plaintiff consult a neurologist and pain management specialist. (T. 187).  Dr. Read advised plaintiff to refrain from physical activity or working that required her to lift, push, pull, twist or stand for more than 30 minutes at a time.  (T. 187).  Dr. Read opined that "a desk job could be tolerated for up to 4 hours per day".  (T. 187).  Dr. Read referred plaintiff to Dr. Malik and Dr. Sims.[12]  (T. 187).

On February 27, 2004, at the request of Dr. Read, MRI films were taken of plaintiff's cervical, lumbar and thoracic spine at Huntsville Memorial Hospital.  (T. 188-189).  The radiologist found "mild broad based protrusion at L5-S1".  (T. 188).  The radiologist noted normal spinal cord signal and no compression.  (T. 188-189).

Sajid Z. Malik, M.D.

The record contains a notation by Dr. Sajid Malik, a neurologist, dated June 14, 2004 and addressed to "whom it may concern".  (T. 205).  In that notation, Dr. Malik stated that plaintiff should avoid any activity or environment that would make her symptoms worse.  (T. 205).  Dr.

---

[11] The record is devoid of any reports or notations from Dr. Read prior to the March 5, 2004 report.

[12] The record does not contain any reports or notations from Dr. Sims.

Malik further stated "[a]t this stage, I don't know the clear etiology of her symptoms or complaints. The work-up is in progress."  (T. 205).

Cherry Matthew, M.D.

On October 21, 2004, plaintiff was examined by Dr. Matthew, a neurologist, at the request of Dr. Read. (T. 206).  Plaintiff complained of experiencing pain in her neck, shoulders and low back for the last 3 years.  (T. 206).  Plaintiff advised that she was a "stay at home mom" and currently taking Naproxen for her pain.[13]  (T. 206).  Upon examination, Dr. Matthew noted that plaintiff was alert and oriented, exhibited a normal gait and demonstrated good coordination.  (T. 206).  Dr. Matthew noted that the EMG studies showed no evidence of any neuropathy.  (T. 207).  Dr. Matthew diagnosed plaintiff with "a diffuse musculoskeletal pain involving the cervical, thoracic and lumbar region and in fact even extensively".  (T. 207).  Dr. Matthew opined that the findings suggested fibromyalgia or related to some underlying degenerative disc disease, but "certainly nothing surgical and certainly no evidence of radiculopathy even though she has a bulging disc".  (T. 207).  Dr. Matthew suggested supportive treatment with anti-inflammatories and Neurontin.[14]  (T. 207).

Joint and Spine Center, P.C.

On November 8, 2004, plaintiff appeared at the Joint and Spine Center for a Functional Capacity Evaluation.[15]  (T. 190).  The evaluator noted that plaintiff was referred to the clinic due

---

[13] Naproxen is a nonsteroidal anti-inflammatory drug used in the treatment of pain, inflammation, and osteoarthritis. *Dorland's* at 1251.

[14] Neurontin is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures. *Id.* at 764, 1287.

[15] The record does not indicate who referred plaintiff to the Center.  The record does not contain the name and/or credentials of the evaluator.

to her chronic pain and dysfunction with musculoskeletal complaints. (T. 190). The evaluator noted that pain was persistent throughout testing with extreme pain with "stooping". (T. 191). The evaluator noted that "normal" straight leg raising was "80" and that, after three trials, plaintiff's maximum raise was  "4 on the left" and "6 on the right".  (T. 192).  The evaluator concluded that plaintiff demonstrated a safe weight lifting ability of 5 pounds.  (T. 197).  The evaluator found that plaintiff was not able to safely lift 15 pounds from the floor to her waist.  (T. 197).

        Plaintiff completed a Low Back Pain Disability Questionnaire for the evaluator and stated that "pain killers give moderate relief".  (T.198).  She further stated that she was able to care for herself; lift very light weights; walk 1/4 miles; sit for 1/2 hour; stand for 10 minutes and maintain a normal sex life but with pain.  (T. 198).  Plaintiff also indicated that she was restricted to her home and could take short trips under 30 minutes.  (T. 198).  Plaintiff was "scored" and given a disability rating of "crippled".  (T. 198).  Plaintiff also completed a Neck Disability Index and was found to have a perceived disability rating of "severe".  (T. 199).


        **B.      State Agency Consultant/Bonnie Blacklock, M.D.**

        On July 21, 2003, Dr. Blacklock completed a "Case Assessment Form" at the request of the agency. (T. 186).  Dr. Blacklock reviewed all of the evidence and diagnosed plaintiff with a "non-severe impairment" and "L-S DDD".  (T. 186).

IV.     ADMINISTRATIVE LAW JUDGE'S DECISION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful work since the alleged onset date of her disability. (T. 16).  At step two, the ALJ concluded that plaintiff has degenerative disc disease with chronic back pain. (T. 12).  The ALJ found this impairment to be severe since it imposed more than a slight limitation on the ability to perform basic work related activities.  (T. 12).  At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations.  (T. 16).  At the fourth step, the ALJ found that plaintiff had the residual functional capacity ("RFC"):

to lift and carry 10 pounds frequently and 20 pounds occasionally and alternately sit and stand at will for 8 hours during the workday, but she cannot perform repetitive pushing and pulling with the arms, climb or work at heights or around moving and dangerous equipment. (T. 16).

The ALJ then concluded that plaintiff retained the RFC to perform her past relevant work as a collections manager or collection clerk. (T. 16). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Act. (T. 16).

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff argues that the ALJ: (1) failed to review and properly assign weight to the medical evidence; (2) failed to properly assess plaintiff's credibility: (3)  failed to properly evaluate plaintiff's RFC; and (4) erroneously concluded that plaintiff could perform her past relevant work.  (Dkt. No. 6).

## A.    Evaluation of Medical Evidence

Plaintiff asserts that the ALJ failed to consider all medical evidence and improperly ignored the opinions of plaintiff's physicians. (Dkt. No. 6, pp. 7-10)  Although not clearly expressed, plaintiff seemingly argues that the ALJ failed to apply the "treating physician rule" to

14

the opinions of Dr. Read and the conclusions of the evaluator at the Joint and Spine Center.[16]  *Id*.

Plaintiff further argues that the ALJ failed to consider evidence of the progression of plaintiff's

disease.  *Id*. at 8.  Defendant argues that the ALJ properly evaluated the evidence of record. (Dkt.

No. 12, p. 6).

The relevant Regulation provides that the Secretary will give controlling weight to a

"treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" if it is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2).  When an ALJ

refuses to assign a treating physician's opinion controlling weight, he must consider a number of

factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the
> treatment relationship; (ii) the evidence in support of the treating physician's
> opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether
> the opinion is from a specialist; and (v) other factors brought to the Social Security
> Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2).  Additionally, the Regulations direct the Commissioner to "give good

reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's]

treating source's opinion".  *Id*.; accord 20 C.F.R. § 416.927(d)(2).

The opinion of the treating physician is not afforded controlling weight where the treating

physician issued opinions that are not consistent with other substantial evidence in the record,

such as the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.

2004); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion

is not controlling when contradicted "by other substantial evidence in the record"); 20 C.F.R. §

---

[16] The Court notes that plaintiff makes no objection to the weight assigned by the ALJ to the opinions
expressed by Drs. Choma, Foster, Malik and Matthew.

404.1527(d)(2).  An opinion that is not based on clinical findings will not be accorded as much weight as an opinion that is well-supported.  20 C.F.R. § 404.1527(d)(3), § 416.927 (d)(3); *see also Stevens v. Barnhart*, 473 F.Supp.2d 357, 362 (N.D.N.Y. 2007).  Similarly, the less consistent an opinion is with the record as a whole, the less weight it is to be given.  *Stevens*, 473 F.Supp.2d at 362; *see also Otts v. Comm'r of Social Sec.*, 249 Fed.Appx. 887, 889 (2d Cir. 2007) (an ALJ may reject such an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record").

A treating source is defined as a plaintiff's own physician or psychologist who has provided plaintiff with medical treatment or evaluation and who has had an ongoing treatment relationship with the plaintiff.  *Fernandez v. Apfel*, 1998 WL 812591, at *3 (E.D.N.Y. 1998) (citing 20 C.F.R.§ 404.1502).  Doctors who see a patient only once do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also Schisler v. Bowen,* 851 F.2d 43, 45 (2d Cir. 1988) (the plaintiff's physician had only seen the plaintiff on two occasions and therefore the nature of his relationship with the plaintiff did not rise to the level of a treating physician).  The amount of weight given to the opinion of a treating physician directly relates to the length of the treatment relationship.  *See* 20 C.F.R. § 404.1527(d)(2)(i).

## 1.    Dr. Read

In this matter, the ALJ discussed Dr. Read's opinions and stated:

> There is no indication that Dr. Read examined the claimant more than one time, and she is not shown to be a treating doctor.  Therefore, the undersigned is not required to give her opinions controlling weight in the evaluation of this case.  (T. 13).

The ALJ concluded:

Based on the results of the MRI scan in February 2004 that showed mild broad based disc protrusion at the L5-S1 level but without evidence of impingement on a nerve root, and considering the normal neurological findings, the undersigned gives the opinions of Dr. Read little weight in the evaluation of this case. (T. 13).

Plaintiff argues that Dr. Read treated plaintiff on more than one occasion and coordinated plaintiff's treatment with other physicians. (Dkt. No. 6, p. 9). However, the record contains only one report from Dr. Read which references only one physical examination. (T. 187). The record is devoid of any evidence that would enable this Court to conclude that Dr. Read was a "treating source". Therefore, the ALJ was not required to assign controlling weight to Dr. Read's conclusions. Moreover, Dr. Read's opinions are further suspect as they are not based upon clinical findings and are inconsistent with other substantial evidence in the record.

Dr. Read stated in her report that she had not reviewed plaintiff's medical records. (T. 187). Dr. Read opined that plaintiff should refrain from physical activity or working "that requires her to lift, push, pull, twist or stand for 30 minutes at a time", however, Dr. Read's examination of plaintiff revealed an "essentially normal neurological exam without focal findings". (T. 187). Dr. Read's opinions do not comport with the objective testing including x-rays, MRI films, EMG studies and nerve conduction studies which were essentially "normal" or revealed "minor abnormalities". (T. 169; 173-177; 188). Dr. Read's opinions are also inconsistent with the opinions expressed by Dr. Grant Foster. Based upon the record and pursuant to the Regulations, Dr. Foster is the only physician who may be described as a "treating source". Dr. Foster specifically found that plaintiff could lift 20 to 25 pounds and repeatedly stated that plaintiff was "ambulatory, stable and neurologically intact". (T. 124, 127).

Plaintiff argues that Dr. Read's opinions should have been afforded greater weight as Dr.

Read's March 2004 examination documented the progression of plaintiff's condition.[17]  (Dkt. No.

6, pp.8-9).  Plaintiff claims that the ALJ failed to acknowledge that all evidence after July 2003

establishes that plaintiff's worsening condition required greater restrictions.  *Id*.  The Court

disagrees.  Although plaintiff alleges a back impairment that is progressively degenerative in

nature, this description is unsupported by clinical findings.  *See Gonzalez v. Schweiker*, 1983 WL

44215, at *7 (S.D.N.Y. 1983); *see also Taveras v. Barnhart*, 2007 WL 1519317, at *2 (E.D.N.Y.

2007) (the plaintiff's claim that his symptoms had worsened despite treatment properly rejected as

inconsistent with other evidence).  The records do not support plaintiff's claim of worsening

symptoms or progression of her disease.  The medical treatment plaintiff received after July 2003

does not indicate or document any progression or worsening of plaintiff's condition.  In fact, Dr.

Matthew, the physician who conducted the most recent examination of plaintiff, concluded that

plaintiff exhibited normal gait with no evidence of radiculopathy.  (T. 207).  Accordingly, the

Court finds substantial evidence to support the ALJ's determination that Dr. Read's opinions are

entitled to "little weight".


### 2.      Joint and Spine Center

Plaintiff contends that the ALJ improperly ignored the RFC assessment by the Joint and

Spine Center.  Plaintiff claims that the evaluation  was "based on objective findings" and "that the

ALJ did not even note this record".  (Dkt. No. 6, p. 9).  The ALJ discussed the Functional

Capacity Evaluation completed at the Joint and Spine Center and stated that "the findings of the

evaluation are questionable".  (T. 14).  The record does not contain the name or credentials of the

---

[17] Although plaintiff argues that Dr. Read examined plaintiff in March 2004, the record does not support
that claim. (T. 187).

individual who evaluated plaintiff at the Joint and Spine Center.  Therefore, the evaluator cannot be deemed an acceptable medical source.  *See* 20 C.F.R. § 416.913(a); *see also Smith v. Shalala*, 856 F.Supp. 118, 126 (E.D.N.Y. 1994) (unlicensed physicians, physician's assistants, osteopaths and psychologists are not acceptable medical sources and therefore, their opinions should be accorded less weight).  The ALJ assigned the appropriate weight to the evaluation as the record reveals that plaintiff was examined only once at the Joint and Spine Center. (T. 190).  *See Duquesnay v. Astrue*, 2007 WL 3095413, at *9 (S.D.N.Y.2007) (concluding that although the record contained an RFC Assessment, the ALJ did not consider this in her decision because it was not prepared by an acceptable medical source pursuant to 20 C.F.R. § 416.913).   The evaluator cannot be considered a treating source and thus, his or her opinions regarding plaintiff's functional abilities are not entitled to controlling weight.

Accordingly, the Court finds that the ALJ properly applied the treating physician rule and expressed good reason for not accepting the opinions of Dr. Read and the evaluation of the Joint and Spine Center.

**B.    Credibility**

Plaintiff argues that the ALJ erred in determining that plaintiff's subjective complaints of pain were "less than fully credible".  (Dkt. No. 11, p. 19).  Specifically, plaintiff claims that although the ALJ referenced SSR 96-7p in the decision, the ALJ failed to evaluate plaintiff's complaints in accordance with the Ruling.[18] (Dkt. No. 6, p. 15).

When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive

---

[18]   Plaintiff cites to SSR 96-7p as requiring the ALJ to evaluate plaintiff's complaints in light of various factors. However, these factors are set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi) and §416.929(c)(3)(i)-(vi).

clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)) .  If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her neck and back pain are consistent with the objective medical and other evidence.  *See* Social Security Ruling 96-7p, 1996 WL 374186, at *2.

The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus*, 615 F.2d at 27; *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility).  When rejecting subjective complaints of pain, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief[.]" *Brandon v. Bowen*, 666 F. Supp 604, 608 (S.D.N.Y. 1987).  If the

Commissioner's findings are supported by substantial evidence, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Secretary, Dept. of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).   A reviewing court's role is merely to determine whether substantial evidence supports the ALJ's decision to discount a claimant's subjective complaints. *Aponte*, 728 F.2d at 591 (quotations and other citations omitted).

In this matter, the ALJ found that plaintiff's testimony was not fully credible or consistent with the record considered as a whole. (T. 16).  The ALJ stated:

> The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein, and the claimant's subjective complaints are found not to be fully credible but somewhat exaggerated. (T. 15).

Having reviewed the record, this Court is satisfied that the ALJ utilized the proper legal standards in his analysis of plaintiff's complaints of pain.  Further, the Court finds that there is substantial evidence to support the ALJ's decision to discredit plaintiff's complaints of disabling pain.  The ALJ referenced plaintiff's testimony regarding her daily activities and abilities and found that "[t]he claimant's activities of daily living suggest that her symptoms are not as severe as alleged".  (T. 15).  The ALJ also noted that plaintiff "stopped working due to pregnancy as opposed to stopping due to a back condition". (T. 15).   In addition to the testimony cited by the ALJ, in November 2004,  plaintiff stated that she was able to care for herself, lift very light weights, walk for 1/4 mile, take short journeys under 30 minutes, and maintain a "nearly normal sex life with pain". (T. 198).

The ALJ noted that objective findings and clinical findings regarding plaintiff's back complaints were normal. (T. 14).  The ALJ stated that plaintiff complained that her pain medication caused "impairment" however, the record is devoid of any documentation or reference

21

by any of her physicians that side effects from medication had disabling effects. (T. 14).  In fact, plaintiff advised Dr. Foster that her medications "relieved her pain temporarily" and advised the evaluator at the Joint and Spine Center that pain killers give her "moderate relief". (T. 110, 198). During plaintiff's most recent examination, Dr. Matthew noted that plaintiff was taking Naproxen.  (T. 207).  Dr. Matthew made no mention of any side effects. (T. 207).  Plaintiff stated that "it was very painful to walk" however, the ALJ found that records from her physicians revealed that plaintiff exhibited a "normal gait". (T. 14).

The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain.  The decision contains enough detail to enable the Court to discern the reasons on which the ALJ relied in discounting plaintiff's allegations of disabling pain.

**C.      Residual Functional Capacity**

Plaintiff argues that the ALJ failed to "properly calculate plaintiff's residual functional capacity". (Dkt. No. 6, p. 10).  In this case, the ALJ found that plaintiff had the RFC to:

> to lift and carry 10 pounds frequently and 20 pounds occasionally and alternately sit and stand at will for 8 hours during the workday, but she cannot perform repetitive pushing and pulling with the arms, climb or work at heights or around moving and dangerous equipment. (T. 16).

The ALJ further found that:

> The claimant's residual functional capacity is consistent with the demands of her past relevant work as a collections manager and collection clerk. (T. 16).

During the administrative hearing, the ALJ solicited testimony from Thomas W. King, a vocational expert.  (T. 44, 240).  The expert classified plaintiff's past relevant work as a collection clerk as sedentary and semi-skilled. (T. 15).  The expert also classified plaintiff's past relevant work as a collections manager as sedentary and skilled.  (T. 15).

22

Plaintiff argues that the RFC determination is flawed in three respects. Plaintiff claims that the ALJ failed to expressly classify plaintiff's exertional capacity.[19] (Dkt. No. 6, pp. 10-11). Plaintiff assumes, based upon the testimony of the vocational expert, that the ALJ found that plaintiff possessed the ability to perform sedentary work, but not light work. *Id*. at p. 11. Plaintiff asserts that substantial evidence exists to conclude that plaintiff cannot perform even sedentary work. *Id*. at p. 12. Finally, plaintiff claims that the limitations assigned by the ALJ prevent plaintiff from performing sedentary work. The Commissioner argues that the ALJ's determination of plaintiff's RFC is based upon the assessments of Dr. Foster which are consistent with the weight of the evidence. (Dkt. No. 12, p. 11).

Residual functional capacity is:

"what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. Social Security Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2,

---

[19] Plaintiff does not cite to any legal authority in support of this argument.

1996).  To determine RFC, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity.  20 C.F.R. § 404.1513(c)(1).  Only after that analysis is completed, may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.  *Hogan v. Astrue*, 491 F.Supp.2d 347, 354 (W.D.N.Y. 2007).

At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.  *Dudelson v. Barnhart*, 2005 WL 2249771, at *9 (S.D.N.Y. 2005); *Murphy v. Barnhart*, 2003 WL 470572, at *9 (S.D.N.Y. 2003).

The Court, having reviewed the entire record, concludes that there is substantial evidence to support the ALJ's assessment of plaintiff's RFC.  Plaintiff's first argument is without merit.  As required by the Regulations, the ALJ made an express finding of plaintiff's RFC and properly detailed the RFC in terms of a function-by-function analysis.[20]  The ALJ concluded, at step 4, that plaintiff retained the RFC to perform her past relevant work.  (T. 16).  Accordingly, the ALJ was not required to express plaintiff's RFC in terms of exertional categories.  *See Dudelson*, 2005 WL 2249771, at *9.

---

[20] Plaintiff does not object to this portion of the RFC assessment.

Plaintiff argues that the ALJ's determination implies that she is capable of performing sedentary work.[21]  Plaintiff claims that she cannot perform sedentary work based upon the opinions expressed by Dr. Read and the Functional Capacity Evaluation of the Joint and Spine Center.  As previously discussed, the opinions of Dr. Read and the evaluator at the Joint and Spine Center were properly assigned little weight by the ALJ.  The RFC is supported by substantial evidence including the opinions of Dr. Foster and the results of objective testing.  The record is devoid of any functional evaluation by any treating source that contradicts the opinion of Dr. Foster that plaintiff may lift 20 - 25 pounds.

Plaintiff claims that the ALJ's determination that plaintiff must "alternately sit and stand" prevents her from performing sedentary work.[22] (Dkt. No. 6, p. 12).  SSR 83-12 provides guidance on the issue of sedentary work and the need to alternate positions.  SSR 83-12 provides:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. . . Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work . . . or the prolonged standing or walking contemplated for most light work.
>
> . . . In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

*See* SSR 83-12, 1983 WL 31253, at *3-4 (SSA 1982).

---

[21] Sedentary work is the least rigorous of the five categories of work recognized by Social Security Administration regulations and is defined as:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a); *see also Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000).

[22] Plaintiff does not argue that her occupational base is significantly eroded by the need to alternate between sitting and standing.

The Commissioner's policy statements do not rule out sedentary work "where a person must alternate between sitting and standing, but rather provide that where a person's inability to sit or stand for extended periods limits his ability to do a full range of work, a vocational expert should be consulted to identify possible jobs available to a person with the claimant's specific limitations". *Tatis v. Barnhart*, 2006 WL 2109510, at *2 (S.D.N.Y. 2006); *see also Boergers v. Apfel*, 1999 WL 166814, at *5 (W.D.N.Y. 1999) (holding that in cases of unusual functional limitations, the Commissioner should consult a vocational specialist to clarify implications for the occupational base).  SSR 83-12 suggests that a vocational expert may determine the number of sedentary jobs that may be performed at the discretion of the worker either sitting or standing alternatively.  *Castillo v. Apfel*, 1999 WL 147748, at *6 (S.D.N.Y. 1999).

In this case, the ALJ found plaintiff should "alternately sit and stand at will for 8 hours during the workday".  (T. 15).  This limitation does not render plaintiff unable to perform any sedentary work.  *See Tatis*, 2006 WL 2109510, at *2; *see also Castillo*, 1999 WL 147748, at *6.  Because this constituted an ability to perform less than a full range of sedentary work, the ALJ was correct in consulting with a vocational expert as to the existence of jobs that a person with plaintiff's exertional limitations and jobs skills would be able to perform.  *See Shin v. Apfel*, 1998 WL 788780, at *8 (S.D.N.Y. 1998).

**D.    Past Relevant Work**

Plaintiff contends that the ALJ erroneously concluded that plaintiff could perform her past relevant work.  (Dkt. No. 6, p. 13).  Plaintiff specifically argues that the ALJ failed to

acknowledge the vocational expert's testimony regarding available work if plaintiff required regular rest periods.[23] *Id.*

The burden of proof that a claimant is able to perform his or her past relevant work, or other work that exists in significant numbers in the national economy, shifts to the Commissioner only after the claimant has carried the initial burden of showing that he or she is unable to perform past relevant work. *Burger v. Barnhart*, 476 F.Supp.2d 248, 255 (W.D.N.Y. 2007). The ALJ is entitled to rely on vocational expert evidence in deciding whether a plaintiff retains the capacity to perform other work which exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1566(e); *see also Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983) (holding that the Commissioner may rely on the testimony of a vocational expert as long as there is substantial evidence to support the assumption upon which the vocational expert based his opinion).

The ALJ noted that:

In response to a hypothetical question by the Administrative Law Judge, which included the physical capacity of the claimant as described above, the vocational expert testified that such a hypothetical person could perform the claimant's past relevant work as a collections manager and collection clerk. (T. 15-16).

During the hearing, the ALJ posed a question to the vocational expert concerning plaintiff's ability to work if she had to "lay down several times during the day". (T. 241-242). The vocational expert testified that such a limitation would render plaintiff unable to do any of her past relevant work. (T. 242). Plaintiff argues that the "ALJ should have credited this aspect of plaintiff's condition as being highly credible". (Dkt. No. 6, p.13). As previously discussed, the

---

[23] Plaintiff also contends that her past work requires the capacity for sedentary work, which plaintiff claims she cannot perform. As previously discussed, substantial evidence exists to support the ALJ's assessment of plaintiff's RFC.

ALJ properly discounted plaintiff's credibility.  Further, there is no evidence in the medical record suggesting that the final question posed to the vocational expert correctly classified plaintiff's situation.  *See Quinones v. Barnhart*, 2006 WL 2136245, at *6 (S.D.N.Y. 2006) (holding that if the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert has no evidentiary value).   Therefore, the ALJ properly disregarded this portion of the expert's testimony.  Based upon the expert's testimony, the ALJ properly concluded that plaintiff could perform her past relevant work and, therefore, that she was not disabled.

## VI.   CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits is **AFFIRMED**; and it is further

**ORDERED** that the defendant's motion for judgment on the pleadings is **GRANTED**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: September 30, 2008
         Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge